# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ------------------------------------------------ ) | | |
| ZACHARY BAUMEL, by his next ) | | |
| friend, STUART DITCHECK, ) | | |
| JONAH BAUMEL, MIRIAM ) | Civil Action No. 06-682 (RMC) | |
| BAUMEL, OSNA BAUMEL and ) | | |
| SHIMON BAUMEL, ) | | |

ZACHARY BAUMEL, by his next )
friend, STUART DITCHECK, )
JONAH BAUMEL, MIRIAM )          Civil Action No. 06-682 (RMC)
BAUMEL, OSNA BAUMEL and )
SHIMON BAUMEL, )
                              )
              Plaintiffs, )
                              )
        -against- )
                              )
SYRIAN ARAB REPUBLIC, )
BASHAR AL-ASSAD, JOHN DOE # )
1, AS REPRESENTATIVE OF THE )
ESTATE OF HAFEZ AL-ASSAD, )
RIFAAT ASSAD, FAROUQ AL )
-SHAARA, IMAD MOUSTAPHA, )
MOUSTAPHA TLAAS, POPULAR )
FRONT FOR THE LIBERATION OF )
PALESTINE, ACHMED JIBRIL )
                              )
And )
                              )
JOHN & JANE DOES 2-99, )
                              )
              Defendants. )
------------------------------------------------ )

## AFFIDAVIT OF STUART DITCHEK IN FURTHER SUPPORT
## OF MOTION FOR THE COURT TO DIRECT SERVICE
## PURSUANT TO THE FOREIGN SOVEREIGN IMMUNITIES ACT

STATE OF FLORIDA        )
                        :       ss.:
COUNTY OF BROWARD   )

STUART DITCHEK, affirms under penalty of perjury that:

1.      I am the next friend of Plaintiff Zachary Baumel in this action.  I

make this affidavit in further support of Plaintiffs' motion for the Court to direct a

method of service on defendants under the Foreign Sovereign Immunities Act ("FSIA"). The facts in this affidavit are based on my personal knowledge and my extensive research, discussions, lobbying and petitioning of the government over the past twenty-four years on behalf of Mr. Baumel.

2.      The purpose of this affidavit is to afford to the Court what information is in Plaintiffs' possession regarding the roles the respective Defendants play in or at the direction of the Government of Syria.

3.      Annexed as Exhibit 1 are relevant excerpts from the State Department's Report on International Terrorism for 2000.

4.      Annexed as Exhibit 2 are relevant excerpts from the State Department's Report on International Terrorism for 2005.

5.      Annexed as Exhibit 3 are relevant excerpts from the State Department's Report on International Terrorism for 2006.

6.      Annexed as Exhibit 4 is are relevant excerpts from the State Department's Report on International Terrorism for 2007.

7.      Some or all of these Reports confirm the following facts.

8.      According to the United States Department of State, Defendant Bashar Al-Assad (and before him Mr. Assad's father, Hafez Al-Assad) is the President of Syria.  As head of state, he has assisted, coordinated and directed acts of terrorism within the scope of his office, including, on information and belief, the actions relating to Zachary Baumel's being held as a hostage and continued captivity.

9.      Defendant Farouq Al-Shaara was the Foreign Minister of Syria under Hafez Al-Assad.  He assisted, coordinated and directed acts of terrorism within the

scope of his office, including, on information and belief, the actions relating to Zachary Baumel's kidnapping, being held as a hostage and continued captivity.

10.    Defendant Imad Moustapha is the present Foreign Minister of Syria. He has assisted, coordinated and directed acts of terrorism within scope of his office, including, on information and belief, the actions relating to Zachary Baumel's kidnapping, being held as a hostage and continued captivity.

11.    Defendant Moustapha Tlaas is the former Defense Minister of Syria. He assisted, coordinated and directed acts of terrorism within the scope of his office, including, on information and belief, the actions relating to Zachary Baumel's kidnapping, being held as a hostage and continued captivity.

12.    Defendant John Doe #1 is the personal representative of the estate of Hafez Al-Assad. Hafez Al-Assad was the former President of Syria and was the father of Bashar Al-Assad. As head of state, he has assisted, coordinated and directed acts of terrorism within the scope of his office, including, on information and belief, the actions relating to Zachary Baumel's kidnapping, being held as a hostage, and continued captivity.

13.    Defendant Rifaat Al-Assad is a former high-ranking member of the Syrian military and the brother of Hafez Al-Assad. He held the rank of General in the military and was the head of a special militia group called the "Pink Panthers." He assisted, coordinated and directed acts of terrorism within the scope of his office, including, on information and belief, the actions relating to Zachary Baumel's kidnapping, being held as a hostage and continued captivity.

14.     Defendant Achmed Jibril is the leader of Defendant the Popular

Front for the Liberation of Palestine – General Command (the "Popular Front"), an

unincorporated association based in Syria.  The United States Department of State has

determined that the Popular Front is a terrorist organization.  The Popular Front is funded

directly or indirectly by the government of Syria and operates out of Syrian territory.  Mr.

Jibril and the Popular Front act at the direction of, and in coordination with, Syria.  *Id.*

15.     Plaintiffs stand ready to properly serve all of these defendants

pursuant to the applicable section of the FSIA.  Plaintiffs believe that each Defendant

qualifies as an "agency or instrumentality" of Syria under the FSIA, but are prepared to

treat any one of them as part of the State should the Court so direct.

WHEREFORE, the Plaintiffs request an Order fixing a method of service

on each Defendant and for such other and further relief as the Court shall deem just and

proper.

_____
STUART DITCHEK

Affirmed before me
on April 21, 2008

_____
Notary Public

NOTARY PUBLIC-STATE OF FLORIDA
David J. Allen
Commission # DD400775
Expires: FEB. 28, 2009
Bonded Thru Atlantic Bonding Co., Inc.

State of Florida
County of Broward
Sworn and subscribed to before me
by *DITCHEK, STUART. H*
on this *24* of *April, 2008*
who presented *New York Driving License*
as identification.

# EXHIBIT 1



# U.S. Department of State, April 2000

## Introduction

The US Government continues its commitment to use all tools necessary—including international diplomacy, law enforcement, intelligence collection and sharing, and military force—to counter current terrorist threats and hold terrorists accountable for past actions. Terrorists seek refuge in "swamps" where government control is weak or governments are sympathetic. We seek to drain these swamps. Through international and domestic legislation and strengthened law enforcement, the United States seeks to limit the room in which terrorists can move, plan, raise funds, and operate. Our goal is to eliminate terrorist safehavens, dry up their sources of revenue, break up their cells, disrupt their movements, and criminalize their behavior. We work closely with other countries to increase international political will to limit all aspects of terrorists' efforts.

US counterterrorist policies are tailored to combat what we believe to be the shifting trends in terrorism. One trend is the shift from well-organized, localized groups supported by state sponsors to loosely organized, international networks of terrorists. Such a network supported the failed attempt to smuggle explosives material and detonating devices into Seattle in December. With the decrease of state funding, these loosely networked individuals and groups have turned increasingly to other sources of funding, including private sponsorship, narcotrafficking, crime, and illegal trade. This shift parallels a change from primarily politically motivated terrorism to terrorism that is more religiously or ideologically motivated. Another trend is the shift eastward of the locus of terrorism from the Middle East to South Asia, specifically Afghanistan. As most Middle Eastern governments have strengthened their counterterrorist response, terrorists and their organizations have sought safehaven in areas where they can operate with impunity.

1

**US Policy Tenets**

Our policy has four main elements:

- **First**, make no concessions to terrorists and strike no deals.
- **Second**, bring terrorists to justice for their crimes.
- **Third**, isolate and apply pressure on states that sponsor terrorism to force them to change their behavior.
- **Fourth**, bolster the counterterrorist capabilities of those countries that work with the United States and require assistance.

The US Government uses two primary legislative tools—the designations of state sponsors and of Foreign Terrorist Organizations (FTOs)—as well as bilateral and multilateral efforts to implement these tenets.

**State Sponsors**

After extensive research and intelligence analysis, the Department of State designates certain states as sponsors of terrorism in order to enlist a series of sanctions against them for providing support for international terrorism. Through these sanctions, the United States seeks to isolate states from the international community, which condemns and rejects the use of terror as a legitimate political tool. This year the Department of State has redesignated the same seven states that have been on the list since 1993: Cuba, Iran, Iraq, Libya, North Korea, Sudan, and Syria.

The designation of state sponsors is not permanent, however. In fact, a primary focus of US counterterrorist policy is to move state sponsors off the list by delineating clearly what steps these countries must take to end their support for terrorism and by urging them to take these steps.

As direct state sponsorship has declined, terrorists increasingly have sought refuge wherever they can. Some countries on the list have reduced dramatically their direct support of terrorism over the past years—and this is an encouraging sign. They still are on the list, however, usually for activity in two categories: harboring of past terrorists (some for more than 20 years) and continuing their linkages to designated Foreign Terrorist Organizations. Cuba is one of the state sponsors that falls in this category.

The harboring of past terrorists, although not an active measure, is still significant in terms of US policy. International terrorists must know unequivocally that they cannot seek haven in states and "wait out" the period until international pressure diminishes. The US Government encourages all state sponsors to terminate all links to terrorism— including harboring old "Cold War terrorists"—and join the international community in observing zero tolerance for terrorism. Of course, if a state sponsor meets the criteria for being dropped from the terrorism list, it will be removed—notwithstanding other differences we may have with a country's other policies and actions.

There have been encouraging signs recently suggesting that some countries are considering taking steps to distance themselves from terrorism. North Korea has made some positive statements condemning terrorism in all its forms. We have outlined clearly to the Government of North Korea the steps it must take to be removed from the list, all of which are consistent with its stated policies. A Middle East peace agreement necessarily would address terrorist issues and would lead to Syria being considered for removal from the list of state sponsors.

In addition to working to move states away from sponsorship, the Department of State constantly monitors other states whose policies and actions increase the threat to US citizens living and working abroad.

**Areas of Concern**

The primary terrorist threats to the United States emanate from two regions, South Asia and the Middle East. Supported by state sponsors, terrorists live in and operate out of areas in these regions with impunity. They find refuge and support in countries that are sympathetic to their use of violence for political gain, derive mutual benefit from harboring terrorists, or simply are weakly governed. The United States will continue to use the designations of state sponsors and Foreign Terrorist Organizations, political and economic pressure, and other means as necessary to compel those states that allow terrorists to live, move, and operate with impunity and those who provide financial and political patronage for terrorists to end their direct or indirect support for terrorism.

In South Asia the major terrorist threat comes from Afghanistan, which continues to be the primary safehaven for terrorists. While not directly hostile to the United States, the Taliban, which controls the majority of Afghan territory, continues to harbor Usama Bin Ladin and a host of other terrorists loosely linked to Bin Ladin, who directly threaten the United States and others in the international community. The Taliban is unwilling to take actions against terrorists trained in Afghanistan, many of whom have been linked to numerous international terrorist plots, including the foiled plots in Jordan and Washington State in December 1999. Pakistan continues to send mixed messages on terrorism. Despite significant and material cooperation in some areas—particularly arrests and extraditions—the Pakistani Government also has tolerated terrorists living and moving freely within its territory. Pakistan's government has supported groups that engage in violence in Kashmir, and it has provided indirect support for terrorists in Afghanistan.

In the Middle East, two state sponsors—Iran and Syria—have continued to support regional terrorist groups that seek to destroy the Middle East peace process. The Iranian Ministry of Intelligence and Security (MOIS) and the Islamic Revolutionary Guard Corps (IRGC) continue to provide training, financial, and political support directly to Lebanese Hizballah, HAMAS, and Palestinian Islamic Jihad operatives who seek to disrupt the peace process. These terrorist organizations, along with others, are based in Damascus, a situation that the Syrian Government made little effort to change in 1999. The Syrian Government—through harboring terrorists,

allowing their free movement, and providing resources—continued to be a crucial link in the terrorist threat emanating from this region during the past year. Lebanon also was a key—although different—link in the terrorist equation. The Lebanese Government does not exercise control over many parts of its territory where terrorist groups operate with impunity, often under Syrian protection, thus leaving Lebanon as another key safehaven for Hizballah, HAMAS, and several other groups the United States has designated as Foreign Terrorist Organizations.

**Foreign Terrorist Organizations (FTOs)**

Secretary Albright in October designated 28 Foreign Terrorist Organizations, dropping three from the previous list (issued in 1997) and adding one. The removal or addition of groups shows our effort to maintain a current list that accurately reflects those groups that are foreign, engage in terrorist activity, and threaten the security of US citizens or the national security of the United States. The designations make members and representatives of those groups ineligible for US visas and subject to exclusion from the United States. US financial institutions are required to block the funds of those groups and of their agents and to report the blocking action to the US Department of the Treasury. Additionally, it is a criminal offense for US persons or persons within US jurisdiction knowingly to provide material support or resources to such groups.

As in the case of state sponsorship, the goal of US policy is to eliminate the use of terrorism as a policy instrument by those organizations it designates as FTOs. Organizations that cease to engage in terrorist-related activities will be dropped from the list.

A complete list of the designated Foreign Terrorist Organizations is included in Appendix B.

**US Diplomatic Efforts**

In addition to continuing our cooperation with close allies and friends, such as the United Kingdom, Canada, Israel, and Japan, we made significant progress on our primary policy objectives with other key governments and organizations. In 2000 we began a bilateral counterterrorist working group with India, and we look forward to increasing US-Indian counterterrorist cooperation in the years ahead.

We worked closely with the Group of Eight (G-8) states and reached a common agreement about the threat that Iran's support for terrorist groups poses to the Middle East peace process. In the meeting in November of counterterrorist experts the G-8 representatives agreed that the Iranian Government had increased its activities and support for HAMAS, the Palestinian Islamic Jihad, and Hizballah with the aim of undermining the Middle East peace process. We explored with G-8 partners ways to exert influence on the Iranian Government to end its sponsorship of those groups.

*Some terrorist groups have demonstrated CBRN use and are actively pursuing CBRN capabilities for several reasons:*

• *Increased publicity highlighted the vulnerability of civilian targets to CBRN attacks. Such attacks could cause lasting disruption and generate significant psychological impact on a population and its infrastructure. As of yearend, the largest attack involving chemical weapons against civilians was Aum Shinrikyo's sarin nerve agent attack on the Tokyo subway system in March 1995.*

• *Some groups, especially those motivated by distorted religious and cultural ideologies, had demonstrated a willingness to inflict greater numbers of indiscriminate casualties. Other less predictable but potentially dangerous groups also had emerged. Those groups may not adhere to traditional targeting constraints.*

• *CBRN materials, information, and technology became more widely available, especially from the Internet and the former Soviet Union.*

Sudan also continued to assist several Islamist and non-Islamist rebel groups based in East Africa. Nonetheless, Sudan's relations with its neighbors appeared to improve in 1999. Ethiopia renewed previously terminated air links, while Eritrea considered reestablishing diplomatic ties. Moreover, in early December, Sudan signed a peace accord with Uganda under which both nations agreed to halt all support for any rebel groups operating on each other's soil.

**Syria**
Syria continued to provide safehaven and support to several terrorist groups, some of which maintained training camps or other facilities on Syrian territory. Ahmad Jibril's Popular Front Liberation of Palestinian–General Command (PFLP–GC) and the Palestinian Islamic Jihad (PIJ), for example, were headquartered in Damascus. In addition, Syria granted a wide variety of terrorist groups—including HAMAS, the PFLP–GC, and the PIJ—basing privileges or refuge in areas of Lebanon's Bekaa Valley under Syrian control. Damascus generally upheld its agreement with Ankara not to support the Kurdish PKK, however.

Syria permitted the resupply of rejectionist groups operating in Lebanon via Damascus. The Syrian Government, nonetheless, continued to restrain their international activities, instructing leaders of terrorist organizations in Damascus in August to refrain from military activities and limit their actions solely to the political realm. Syria also participated in a multinational monitoring group to prevent attacks against civilian targets in southern Lebanon and northern Israel.

## Appendix A

## Chronology of Significant Terrorist Incidents, 1999

# EXHIBIT 2



US Department of State
*Office of the Coordinator for Counterterrorism*

# Country Reports on Terrorism 2004

## April 2005

Department of State Publication 11248
Office of the Coordinator for Counterterrorism
Printed in Multi-Media Services

Released April 2005

## North Korea

The Democratic People's Republic of Korea (DPRK) is not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987.

At a summit with Japanese Prime Minister Koizumi in Pyongyang in September 2002, National Defense Commission Chairman Kim Jong Il acknowledged the involvement of DPRK "special institutions" in the kidnapping of Japanese citizens and said that those responsible had already been punished. Pyongyang in 2003 allowed the return to Japan of five surviving abductees, and in 2004 of eight family members, mostly children, of those abductees. Questions about the fate of other abductees remain the subject of ongoing negotiations between Japan and the DPRK. In November, the DPRK returned to Japan what it identified as the remains of two Japanese abductees whom the North had reported as having died in North Korea. Subsequent DNA testing in Japan indicated that the remains were not those of Megumi Yokota or Kaoru Matsuki, as Pyongyang had claimed, and the issue remained contentious at year's end. Four Japanese Red Army members remain in the DPRK following their involvement in a jet hijacking in 1970; five of their family members returned to Japan in 2004.

Although it is a party to six international conventions and protocols relating to terrorism, Pyongyang has not taken substantial steps to cooperate in efforts to combat international terrorism.

## Sudan

In 2004, despite serious strains in US-Sudanese relations regarding the ongoing violence in Darfur, US-Sudanese counterterrorism cooperation continued to improve. While Sudan's overall cooperation and information sharing improved markedly and produced significant progress in combating terrorist activity, areas of concern remain. In May, the US Government certified to Congress a list of countries not fully cooperating in US antiterrorism efforts. For the first time in many years, this list did not include Sudan.

Sudan increased cooperation with Ugandan authorities to diminish the capabilities of the Lord's Resistance Army (LRA), a Ugandan group which has terrorized civilians in northern Uganda and has claimed that it wants to overthrow the current Ugandan Government. The Ugandan military, with Sudanese Government cooperation, inflicted a series of defeats on the LRA at its hideouts in southern Sudan, forcing its leaders to flee into Uganda and engage in peace talks with the Ugandan Government.

Domestically, the Government of Sudan stepped up efforts to disrupt extremist activities and deter terrorists from operating in Sudan. In March 2004, a new HAMAS representative arrived in Khartoum. According to some press reports, he was received by Sudanese officials in an official capacity. In response to ongoing US concern, the Sudanese Government closed a HAMAS office in Khartoum in September. In August, Sudanese authorities arrested, prosecuted, and convicted Eritreans who had hijacked a Libyan aircraft and forced it to land in Khartoum. In October, the United States designated the Khartoum-based NGO Islamic African Relief Agency as a supporter of terrorism under EO 13224 for its support of Usama bin Ladin and al-Qa'ida.

The Sudanese Government also took steps in 2004 to strengthen its legislative and bureaucratic instruments for fighting terrorism. In January, Sudan co-hosted a three-day workshop on international cooperation on counterterrorism and the fight against transnational organized crime with the United Nations Office of Drug Control. Neighboring countries from the Horn of Africa and member states of the Inter-Governmental Authority on Development (IGAD) attended the workshop, which culminated in the "Khartoum Declaration on Terrorism and Transnational Organized Crime," in which IGAD member states reaffirmed their commitment to the fight against terrorism. The Khartoum Declaration also focused on the technical assistance needs of the IGAD member states with regard to implementing the 12 international conventions and protocols against terrorism.

## Syria

The Syrian Government in 2004 continued to provide political and material support to both Lebanese Hizballah and Palestinian terrorist groups. HAMAS, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PFLP) and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), among others, continue to operate from Syria, although they have lowered their public profiles since May 2003, when Damascus announced that the groups had voluntarily closed their offices. Many of these Palestinian groups, in statements originating from both inside and outside of Syria, claimed responsibility for anti-Israeli terrorist attacks in 2004. The Syrian Government insists that these Damascus-based offices undertake only political and informational activities. Syria also continued to permit Iran to use Damascus as a transshipment point for resupplying Lebanese Hizballah in Lebanon.

Syrian officials have publicly condemned international terrorism, but make a distinction between terrorism and what they consider to be the legitimate armed resistance of Palestinians in the occupied territories and of Lebanese Hizballah. The Syrian Government has not been implicated directly in an act of terrorism since 1986, although Israeli officials accused Syria of being indirectly involved in the August 31, 2004, Beersheva bus bombings that left 16 dead.

## Chemical, Biological, Radiological, Nuclear (CBRN) Terrorism

*Production of weapons of mass destruction (WMD) and their delivery systems constitutes a major threat to international peace and security. The threat is compounded by the interests of terrorists in acquiring WMD. This would undermine the foundations of international order. We pledge to use all means available to avert WMD proliferation and the calamities that would follow.*

Joint statement by President George W. Bush, European Council President Konstandinos Simitis, and European Commission President Romano Prodi

The September 11, 2001, attacks confirmed that terrorists will seek to produce mass casualties whenever they believe it serves their purposes. Although terrorists will probably continue to rely on traditional terrorist tactics, several groups — including al-Qa'ida — increasingly look to chemical, biological, radiological, or nuclear (CBRN) materials as a means to cause mass casualties rivaling or exceeding those of September 11. Troublesome amounts of dangerous materials, and information about how to create and deliver CBRN weapons, remain available to terrorists.

Usama bin Ladin has said he sees the acquisition of WMD as a "religious duty," and he has threatened to use such weapons. This rhetoric was underscored by reports that documents retrieved from al-Qa'ida facilities in Afghanistan contain information on CBRN materials.

However, the threat is not limited to bin Ladin and al-Qa'ida. Information indicates that small but growing numbers of other terrorist groups are also interested in CBRN materials. In Europe, French police seized a chemical contamination suit and arrested a terrorist cell in December 2002 that allegedly was planning an attack using chemical agents.

CBRN terrorism events to date have generally involved crude and improvised delivery means that have been only marginally effective. With the exceptions of the 1995 Aum Shinrikyo attacks in Tokyo and the 2001 US anthrax attacks, the materials employed in these events also have been crudely manufactured. Other events have involved dual-use materials that have legitimate civilian applications, such as industrial chemicals, poisons, pesticides, and radiological source materials embedded in legitimate measuring instruments. Although terrorist events involving these materials and improvised delivery systems can cause significant casualties, damage, and disruption, such events pale in comparison to the casualties and damage that could occur if terrorists acquired WMD and the ability to deliver them effectively.

Preventing the proliferation of WMD, their delivery systems, and related materials and technologies has long been a pillar of national security. Since September 11, the nonproliferation of WMD has become an even more urgent priority. President Bush made this clear in his December 2002 National Strategy to Combat Weapons of Mass Destruction, in which he set out a comprehensive strategy to prevent WMD proliferation, including to terrorists.

In May 2003, President Bush announced the Proliferation Security Initiative (PSI), a global multilateral arrangement to seize sensitive cargoes that may be in transit to and from states and nonstate actors of proliferation concern. PSI is an interdiction program. PSI participants jointly explore and train in the best use of counterproliferation tools — diplomatic, intelligence, and operational — to stop proliferation at sea, in the air, and on land. The United States is working within multilateral non-proliferation regimes and other international fora. Bilaterally, the United States promotes more stringent non-proliferation policies and programs; strengthened export controls; and improved border security to prevent terrorists or their state sponsors from acquiring WMD, their delivery systems, related materials, or technologies. As the President's National Strategy notes, however, should diplomatic efforts fall short, the United States will be prepared to deter and defend against the full range of WMD threats.

Damascus has cooperated with the United States and other foreign governments against al-Qa'ida and other terrorist organizations and individuals; it also has discouraged signs of public support for al-Qa'ida, including in the media and at mosques.

In September 2004, Syria hosted border security discussions with the Iraqis and took a number of measures to improve the physical security of the border and establish security cooperation mechanisms. Although these and other efforts by the Syrian Government have been partly successful, more must be done in order to prevent the use of Syrian territory by those individuals and groups supporting the insurgency in Iraq.

## Activities

Abbas' group was responsible for the attack in 1985 on the Italian cruise ship Achille Lauro and the murder of US citizen Leon Klinghoffer. Abu Abbas died of natural causes in April 2004 while in US custody in Iraq. Current leadership and membership of the relatively small PLF appears to be based in Lebanon and the Palestinian territories. The PLF has become more active since the start of the al-Aqsa intifadah and several PLF members have been arrested by Israeli authorities for planning attacks in Israel and the West Bank.

## Strength

Unknown.

## Location/Area of Operation

Based in Iraq since 1990, has a presence in Lebanon and the West Bank.

## External Aid

Received support mainly from Iraq; has received support from Libya in the past.

# Palestinian Islamic Jihad (PIJ)

a.k.a. Islamic Jihad of Palestine, PIJ-Shaqaqi Faction, PIJ-Shalla Faction, Al-Quds Brigades

## Description

Formed by militant Palestinians in the Gaza Strip during the 1970s, the Palestinian Islamic Jihad (PIJ) is committed to the creation of an Islamic Palestinian state and the destruction of Israel through attacks against Israeli military and civilian targets inside Israel and the Palestinian territories.

## Activities

PIJ militants have conducted many attacks, including large-scale suicide bombings, against Israeli civilian and military targets. The group maintained operational activity in 2004, claiming numerous attacks against Israeli interests. PIJ has not yet directly targeted US interests; it continues to direct attacks against Israelis inside Israel and the territories, although US citizens have died in attacks mounted by the PIJ.

## Strength

Unknown.

## Location/Area of Operation

Primarily Israel, the West Bank, and the Gaza Strip. The group's primary leadership resides in Syria, though other leadership elements reside in Lebanon, as well as other parts of the Middle East.

## External Aid

Receives financial assistance from Iran and limited logistical assistance from Syria.

# Popular Front for the Liberation of Palestine (PFLP)

## Description

Formerly a part of the PLO, the Marxist-Leninist PFLP was founded by George Habash when it broke away from the Arab Nationalist Movement in 1967. The PFLP does not view the Palestinian struggle as religious, seeing it instead as a broader revolution against Western imperialism. The group earned a reputation for spectacular international attacks, including airline hijackings, that have killed at least 20 US citizens.

## Activities

The PFLP committed numerous international terrorist attacks during the 1970s. Since 1978, the group has conducted attacks against Israeli or moderate Arab targets, including killing a settler and her son in December 1996. The PFLP has stepped up its operational activity since the start of the current intifadah, highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and assassination of the Israeli Tourism Minster in 2001 to avenge Israel's killing of the PFLP Secretary General earlier that year.

## Strength

Unknown.

## Location/Area of Operation

Syria, Lebanon, Israel, the West Bank, and the Gaza Strip.

## External Aid

Receives safe haven and some logistical assistance from Syria.

# Popular Front for the Liberation of Palestine–General Command (PFLP-GC)

## Description

The PFLP-GC split from the PFLP in 1968, claiming it wanted to focus more on fighting and less on politics. Originally it was violently opposed to the Arafat-led PLO. The group is led by Ahmad Jabril, a former captain in the Syrian Army, whose son Jihad was killed by a car bomb in May 2002. The PFLP-GC is closely tied to both Syria and Iran.

## Activities

Carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s. Known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders. Primary focus is now on guerrilla operations in southern Lebanon and small-scale attacks in Israel, the West Bank, and the Gaza Strip.

**Strength**
Several hundred.

**Location/Area of Operation**
Headquartered in Damascus with bases in Lebanon.

**External Aid**
Receives logistical and military support from Syria and financial support from Iran.

# Al-Qa'ida
a.k.a. Usama Bin Ladin Organization

## Description
Al-Qa'ida was established by Usama Bin Ladin in 1988 with Arabs who fought in Afghanistan against the Soviet Union. Helped finance, recruit, transport, and train Sunni Islamic extremists for the Afghan resistance. Goal is to unite Muslims to fight the United States as a means of defeating Israel, overthrowing regimes it deems "non-Islamic," and expelling Westerners and non-Muslims from Muslim countries. Eventual goal would be establishment of a pan-Islamic caliphate throughout the world. Issued statement in February 1998 under the banner of "The World Islamic Front for Jihad Against the Jews and Crusaders" saying it was the duty of all Muslims to kill US citizens, civilian and military, and their allies everywhere. Merged with al-Jihad (Egyptian Islamic Jihad) in June 2001, renaming itself "Qa'idat al-Jihad." Merged with Abu Mus'ab al-Zarqawi's organization in Iraq in late 2004, with al-Zarqawi's group changing its name to "Qa'idat al-Jihad fi Bilad al-Rafidayn" (al-Qa'ida in the Land of the Two Rivers).

## Activities
In 2004, the Saudi-based al-Qa'ida network and associated extremists launched at least 11 attacks, killing over 60 people, including six Americans, and wounding more than 225 in Saudi Arabia. Focused on targets associated with US and Western presence and Saudi security forces in Riyadh, Yanbu, Jeddah, and Dhahran. Attacks consisted of vehicle bombs, infantry assaults, kidnappings, targeted shootings, bombings, and beheadings. Other al-Qa'ida networks have been involved in attacks in Afghanistan and Iraq.

In 2003, carried out the assault and bombing on May 12 of three expatriate housing complexes in Riyadh, Saudi Arabia, that killed 30 and injured 216. Backed attacks on May 16 in Casablanca, Morocco, of a Jewish center, restaurant, nightclub, and hotel that killed 33 and injured 101. Probably supported the bombing of the J.W. Marriott Hotel in Jakarta, Indonesia, on August 5, that killed 12 and injured 149. Responsible for the assault and bombing on November 9 of a housing complex in Riyadh, Saudi Arabia, that killed 17 and injured 122. The suicide bombers and others associated with the bombings of two synagogues in Istanbul, Turkey, on November 15 that killed 20 and injured 300 and the bombings in Istanbul of the British Consulate and HSBC Bank on November 20 that resulted in 41 dead and 555 injured had strong links to al-Qa'ida. Conducted two assassination attempts against Pakistani President Musharraf in December 2003. Was involved in some attacks in Afghanistan and Iraq.

In 2002, carried out bombing on November 28 of a hotel in Mombasa, Kenya, killing 15 and injuring 40. Probably supported a nightclub bombing in Bali, Indonesia, on October 12 by Jemaah Islamiya that killed more than 200. Responsible for an attack on US military personnel in Kuwait on October 8 that killed one US soldier and injured another. Directed a suicide attack on the tanker M/V Limburg off the coast of Yemen on October 6 that killed one and injured four. Carried out a firebombing of a synagogue in Tunisia on April 11 that killed 19 and injured 22. On September 11, 2001, 19 al-Qa'ida suicide attackers hijacked and crashed four US commercial jets — two into the World Trade Center in New York City, one into the Pentagon near Washington, DC, and a fourth into a field in Shanksville, Pennsylvania — leaving nearly 3,000 individuals dead or missing. Directed the attack on the USS Cole in the port of Aden, Yemen, on October 12, 2000, killing 17 US Navy sailors and injuring another 39.

Conducted the bombings in August 1998 of the US Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, that killed at least 301 individuals and injured more than 5,000 others. Claims to have shot down US helicopters and killed US servicemen in Somalia in 1993 and to have conducted three bombings that targeted US troops in Aden, Yemen, in December 1992.

Al-Qa'ida is linked to the following plans that were disrupted or not carried out: to bomb in mid-air a dozen US trans-Pacific flights in 1995, and to set off a bomb at Los Angeles International Airport in 1999. Also plotted to carry out terrorist operations against US and Israeli tourists visiting Jordan for millennial celebrations in late 1999 (Jordanian authorities thwarted the planned attacks and put 28 suspects on trial). In December 2001, suspected al-Qa'ida associate Richard Colvin Reid attempted to ignite a shoe bomb on a trans-Atlantic flight from Paris to Miami. Attempted to shoot down an Israeli chartered plane with a surface-to-air missile as it departed the Mombasa, Kenya, airport in November 2002.

## Strength
Al-Qa'ida's organizational strength is difficult to determine in the aftermath of extensive counterterrorist efforts since 9/11. However, the group probably has several thousand extremists and associates worldwide inspired by the group's ideology. The arrest and deaths of mid-level and senior al-Qa'ida operatives have disrupted some communication, financial, and facilitation nodes and interrupted

# EXHIBIT 3

**United States Department of State**
**Office of the Coordinator for Counterterrorism**

# Country Reports on Terrorism 2005

## April 2006

United States Department of State Publication 11324
Office of the Coordinator for Counterterrorism
*Released April 2006*

# Chapter 6

## STATE SPONSORS OF TERROR OVERVIEW

Libya and Sudan continued to take significant steps to cooperate in the global war on terror. Cuba, Iran, North Korea, and Syria, however, continued to maintain their ties to terrorist groups. Iran and Syria routinely provide unique safe haven, substantial resources and guidance to terrorist organizations.

State sponsors of terrorism provide critical support to non-state terrorist groups. Without state sponsors, terrorist groups would have much more difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations. Most worrisome is that some of these countries also have the capability to manufacture WMD and other destabilizing technologies that can get into the hands of terrorists. The United States will continue to insist that these countries end the support they give to terrorist groups.

### State Sponsor: Implications

Designating countries that repeatedly provide support for acts of international terrorism (that is, placing a country on the terrorism list) imposes four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.

2. Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.

3. Prohibitions on economic assistance.

4. Imposition of miscellaneous financial and other restrictions, including:

   - Requiring the United States to oppose loans by the World Bank and other international financial institutions;
   - Lifting diplomatic immunity to allow families of terrorist victims to file civil lawsuits in U.S. courts;
   - Denying companies and individuals tax credits for income earned in terrorist-listed countries;
   - Denial of duty-free treatment of goods exported to the United States;
   - Authority to prohibit any U.S. citizen from engaging in a financial transaction with a terrorist-list government without a Treasury Department license; and
   - Prohibition of Defense Department contracts above $100,000 with companies controlled by terrorist-list states.

Continued focus was placed on Sudan for its role in contributing fighters for the Iraqi insurgency. Sudanese and foreign nationals who transited Sudan have been captured as foreign fighters in Iraq. The Sudanese have taken steps, through self-initiation and encouragement by the United States and other international actors, to disrupt jihadists both traveling to and returning from Iraq; however, significant gaps in knowledge and capability to identify and capture such individuals remain.

The Sudanese Government has increased its participation in international events aimed at defining and preventing terrorism, and has pledged to strengthen its laws to better combat acts of terror. In February, representatives from Khartoum attended an international counterterrorism conference hosted by Saudi Arabia at which Sudan expressed its full cooperation with international efforts to combat terrorism. Furthermore, Sudan hosted a similar conference in September for regional partners interested in developing improved means of addressing terrorism issues in East Africa. Overall in 2005, Sudan continued its progress in cooperation to combat terrorism locally and internationally, with some areas of concern remaining.

**Syria**

The Syrian Government continued to provide political and material support to both Hizballah and Palestinian terrorist groups. HAMAS, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PLFP), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), among others, base their external leadership in Damascus. The Syrian Government insists that the Damascus-based groups undertake only political and informational activities. However, in statements originating from outside Syria, many Palestinian groups claimed responsibility for anti-Israeli terrorist acts. Syria's public support for the groups varied, depending on its national interests and international pressure. In 2003, these groups lowered their public profile after Damascus announced that they had voluntarily closed their offices in Syria. In September, however, Syrian President Bashar al-Asad held a highly publicized meeting with rejectionist leaders, and a month later the rejectionist leaders participated in a meeting in Damascus with the Speaker of the Iranian Parliament, Gholam Ali Haddad Adel. Syria continued to permit Iran to use Damascus as a transshipment point to resupply Hizballah in Lebanon.

Syrian officials publicly condemned international terrorism, but made a distinction between terrorism and what they considered to be "legitimate armed resistance" by Palestinians in the Occupied Territories and by Lebanese Hizballah. The Syrian Government has not been implicated directly in an act of terrorism since 1986, although preliminary findings of a UN investigation into the February assassination of former Lebanese Prime Minister Rafik Hariri have indicated a strong likelihood of official Syrian involvement.

During the past seven years there have been no acts of terrorism against American citizens in Syria. Damascus has repeatedly assured the United States that it will take every possible measure to protect U.S. citizens and facilities in Syria.

**Activities**
PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings, against Israeli civilian and military targets. In 2005, the group increased operational activity over the previous year and claimed several attacks against Israeli interests, including five suicide bombings. PIJ continues to plan and direct attacks against Israelis both inside Israel and in the Palestinian territories. Although U.S. citizens have died in attacks mounted by the PIJ, the group has not directly targeted U.S. interests.

**Strength**
Unknown.

**Location/Area of Operation**
Primarily Israel, the West Bank, and the Gaza Strip. The group's central leadership resides in Syria. Other leadership elements reside in Lebanon, and official representatives are scattered throughout the Middle East.

**External Aid**
Receives financial assistance primarily from Iran. Syria provides the group with a safe haven.


# Popular Front for the Liberation of Palestine (PFLP)

**Description**
Formerly a part of the PLO, the Marxist-Leninist PFLP was founded by George Habash when it broke away from the Arab Nationalist Movement in 1967. The PFLP does not view the Palestinian struggle as religious, seeing it instead as a broader revolution against Western imperialism. The group earned a reputation for spectacular international attacks, including airline hijackings, that have killed at least 20 U.S. citizens.

**Activities**
The PFLP committed numerous international terrorist attacks during the 1970s. Since 1978, the group has conducted attacks against Israeli and moderate Arab targets, including the killing of an Israeli settler and her son in December 1996. The PFLP has stepped up its operational activity since the start of the current intifada, highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of the Israeli Tourism Minster in 2001 to avenge Israel's killing of the PFLP Secretary General earlier that year.

**Strength**
Unknown.

**Location/Area of Operation**
Syria, Lebanon, Israel, the West Bank, and the Gaza Strip.

**External Aid**
Receives safe haven and some logistical assistance from Syria.

# Popular Front for the Liberation of Palestine–General Command (PFLP-GC)

**Description**
The PFLP-GC split from the PFLP in 1968, claiming it wanted to focus more on fighting and less on politics. Originally, the group was violently opposed to the Arafat-led PLO. Ahmad Jibril, a former captain in the Syrian Army whose son Jihad was killed by a car bomb in May 2002, has led the PFLP-GC since its founding. The PFLP-GC is closely tied to both Syria and Iran.

**Activities**
The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s. The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders. The group's primary focus now is on guerrilla operations in southern Lebanon, training of other Palestinian terrorist groups, and small-scale attacks in Israel, the West Bank, and the Gaza Strip. Ahmad Jibril denied accusations made in a United Nations investigation that PFLP-GC members were involved in the February assassination of former Lebanese Prime Minister Rafiq al-Hariri.

**Strength**
Several hundred.

**Location/Area of Operation**
Headquartered in Damascus with bases in Lebanon.

**External Aid**
Receives logistical and military support from Syria and financial support from Iran.

# Al-Qaida[*]

a.k.a. International Front for Fighting Jews and Crusaders;
Islamic Army;
Islamic Army for the Liberation of Holy Sites;
Islamic Salvation Foundation;
The Base;
The Group for the Preservation of the Holy Sites;
The Islamic Army for the Liberation of the Holy Places;
The World Islamic Front for Jihad Against Jews and Crusaders;

---

[*] Listed on the UN 1267 Committee List.

# EXHIBIT 4

 United States Department of State

# COUNTRY REPORTS ON TERRORISM 2006

United States Department of State Publication 11409
Office of the Coordinator for Counterterrorism
Released April 2007

Country Reports on Terrorism 2006 is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.

# CHAPTER 3.
## STATE SPONSORS OF TERRORISM

State sponsors of terrorism provide critical support to non-state terrorist groups. Without state sponsors, terrorist groups would have much more difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations. Most worrisome is that some of these countries also have the capability to manufacture weapons of mass destruction (WMD) and other destabilizing technologies that could get into the hands of terrorists. The United States will continue to insist that these countries end the support they give to terrorist groups.

As a result of the historic decisions taken by Libya's leadership in 2003 to renounce terrorism and to abandon its WMD programs, the United States rescinded Libya's designation as a state sponsor of terrorism on June 30. Since pledging to renounce terrorism in 2003, Libya has cooperated closely with the United States and the international community on counterterrorism efforts.

Sudan continued to take significant steps to cooperate in the War on Terror. Cuba, Iran, and Syria, however, have not renounced terrorism or made efforts to act against Foreign Terrorist Organizations. Iran and Syria routinely provided safe haven, substantial resources, and guidance to terrorist organizations.

Venezuela was certified by the Secretary of State as "not fully cooperating" with U.S. counterterrorism efforts. The designation, included in Section 40A of the Arms Export Control Act, was based on a review of Venezuela's overall efforts to fight terrorism. Effective October 1, the decision imposed sanctions on all commercial arms sales and transfers. It remains in effect until September 30, 2007, when it may be renewed by a determination by the Secretary. (Venezuela is the only nation certified as "not fully cooperating" that is not a state sponsor of terrorism.)

## STATE SPONSOR: IMPLICATIONS

Designating countries that repeatedly provide support for acts of international terrorism as state sponsors of terrorism imposes four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.

2. Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.

3. Prohibitions on economic assistance.

4. Imposition of miscellaneous financial and other restrictions, including:

   • Requiring the United States to oppose loans by the World Bank and other international financial institutions;

   • Lifting diplomatic immunity to allow families of terrorist victims to file civil lawsuits in U.S. courts;

- Denying companies and individuals tax credits for income earned in terrorist-listed countries;

- Denial of duty-free treatment of goods exported to the United States;

- Authority to prohibit any U.S. citizen from engaging in a financial transaction with a terrorist-list government without a Treasury Department license; and

- Prohibition of Defense Department contracts above $100,000 with companies controlled by terrorist-list states.

## CUBA

Cuba continued to publicly oppose the U.S.- led Coalition prosecuting the War on Terror. To U.S. knowledge, Cuba did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank. No new counterterrorism laws were enacted, nor were any executive orders or regulations issued in this regard. To date, the Cuban government had not undertaken any counterterrorism efforts in international and regional fora or taken action against any designated Foreign Terrorist Organizations. The Government of Cuba provided safe haven to members of ETA, FARC, and the ELN, and maintained close relationships with other state sponsors of terrorism such as Iran. The Cuba-Iran Joint Commission met in Havana in January.

The Cuban government continued to permit U.S. fugitives to live legally in Cuba and is unlikely to satisfy U.S. extradition requests for terrorists harbored in the country. The United States periodically requested that the government return wanted fugitives[1], and Cuba continued to be non-responsive. The Cuban regime publicly demanded the return to Cuba of five of its agents convicted of espionage in the United States. The five were variously accused of being foreign intelligence agents and infiltrating U.S. military facilities, but the Cuban government continued to refer to these individuals as heroes in the fight against terrorism. One was accused of conspiracy to murder for his role in the Cuban Air Force's shooting down of two small civilian planes. Cuba has stated, however, that it will no longer provide safe haven to new U.S. fugitives who may enter Cuba.[2]

Although Cuba did not extradite suspected terrorists during the year, the government demanded that the United States surrender Luis Posada Carriles, whom it accused of plotting to kill Castro and bombing a Cubana Airlines plane in 1976, which resulted in more than 70 deaths. Posada Carriles remained in U.S. custody. Cuba also asked the United States to return three Cuban-Americans implicated in the same cases.

---

1   U.S. fugitives range from convicted murderers, two of whom killed police officers, to numerous hijackers. Most of those fugitives entered Cuba in the 1970s. In previous years, the Government of Cuba responded to requests to extradite U.S. fugitives by stating that approval would be contingent upon the U.S. returning wanted Cuban criminals.

2   During September, a U.S. fugitive sequestered his son, stole a plane at a local airport in the Florida Keys, and landed illegally in Varadero, east of Havana. American Interests Section efforts resulted in a visit to the male individual and his son in Varadero. After several meetings between the aforementioned USINT Offices and Cuban government officials, the son was returned in October to his mother in Mexico, who had legal custody. Simultaneously, the father was returned to the United States via charter flight to Miami, where he is being prosecuted. The stolen private plane was later returned to the United States. This was the first instance in which the Cuban government permitted the return of a fugitive from U.S. justice.

# CHAPTER 3.
## STATE SPONSORS OF TERRORISM

State sponsors of terrorism provide critical support to non-state terrorist groups. Without state sponsors, terrorist groups would have much more difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations. Most worrisome is that some of these countries also have the capability to manufacture weapons of mass destruction (WMD) and other destabilizing technologies that could get into the hands of terrorists. The United States will continue to insist that these countries end the support they give to terrorist groups.

As a result of the historic decisions taken by Libya's leadership in 2003 to renounce terrorism and to abandon its WMD programs, the United States rescinded Libya's designation as a state sponsor of terrorism on June 30. Since pledging to renounce terrorism in 2003, Libya has cooperated closely with the United States and the international community on counterterrorism efforts.

Sudan continued to take significant steps to cooperate in the War on Terror. Cuba, Iran, and Syria, however, have not renounced terrorism or made efforts to act against Foreign Terrorist Organizations. Iran and Syria routinely provided safe haven, substantial resources, and guidance to terrorist organizations.

Venezuela was certified by the Secretary of State as "not fully cooperating" with U.S. counterterrorism efforts. The designation, included in Section 40A of the Arms Export Control Act, was based on a review of Venezuela's overall efforts to fight terrorism. Effective October 1, the decision imposed sanctions on all commercial arms sales and transfers. It remains in effect until September 30, 2007, when it may be renewed by a determination by the Secretary. (Venezuela is the only nation certified as "not fully cooperating" that is not a state sponsor of terrorism.)

## STATE SPONSOR: IMPLICATIONS

Designating countries that repeatedly provide support for acts of international terrorism as state sponsors of terrorism imposes four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.

2. Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.

3. Prohibitions on economic assistance.

4. Imposition of miscellaneous financial and other restrictions, including:

   - Requiring the United States to oppose loans by the World Bank and other international financial institutions;

   - Lifting diplomatic immunity to allow families of terrorist victims to file civil lawsuits in U.S. courts;

145

# IRAN

Iran remained the most active state sponsor of terrorism. Its Islamic Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) were directly involved in the planning and support of terrorist acts and continued to exhort a variety of groups, especially Palestinian groups with leadership cadres in Syria and Lebanese Hizballah, to use terrorism in pursuit of their goals.

Iran maintained a high-profile role in encouraging anti-Israeli terrorist activity, rhetorically, operationally, and financially. Supreme Leader Khamenei and President Ahmadi-Nejad praised Palestinian terrorist operations, and Iran provided Lebanese Hizballah and Palestinian terrorist groups – notably HAMAS, Palestinian Islamic Jihad, the al-Aqsa Martyrs Brigades, and the Popular Front for the Liberation of Palestine-General Command – with extensive funding, training, and weapons.

Iran continued to play a destabilizing role in Iraq, which appeared to be inconsistent with its stated objectives regarding stability in Iraq. Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology.  These individuals then passed on this training to additional militants in Iraq.

Iran remained unwilling to bring to justice senior AQ members it detained in 2003, and it has refused to publicly identify these senior members in its custody. Iran has repeatedly resisted numerous calls to transfer custody of its AQ detainees to their countries of origin or third countries for interrogation or trial. Iran also continued to fail to control the activities of some al-Qaida members who fled to Iran following the fall of the Taliban regime in Afghanistan.

# NORTH KOREA

The Democratic People's Republic of Korea (DPRK) was not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987. The DPRK continued to harbor four Japanese Red Army members who participated in a jet hijacking in 1970. The Japanese government continued to seek a full accounting of the fate of the 12 Japanese nationals believed to have been abducted by DPRK state entities; five such abductees have been repatriated to Japan since 2002. In the February 13, 2007 Initial Actions Agreement, the United States agreed to "begin the process of removing the designation of the DPRK as a state-sponsor of terrorism."

# SUDAN

The Sudanese government was a strong partner in the War on Terror and aggressively pursued terrorist operations directly involving threats to U.S. interests and personnel in Sudan. In recent months, Usama Bin Laden and other senior al-Qaida leaders have called for the expansion of AQ's presence in Sudan in response to possible deployment of UN peacekeepers in Darfur. This has led to speculation that some individuals with varying degrees of association with AQ have taken steps to establish an operational network in Darfur, but there were no indications that AQ affiliated extremists were active there.

With the exception of HAMAS, the Sudanese government did not openly support the presence of extremist elements in Sudan. The Sudanese government took steps to limit the activities of these organizations. For example, Sudanese officials welcomed HAMAS members as representatives of the Palestinian Authority (PA), but limited their activities to fundraising. The Sudanese government also worked to disrupt foreign fighters from using Sudan as a logistics base and transit point for Jihadists going to Iraq. There was some evidence to suggest that individuals who were active participants in the Iraqi insurgency have returned to Sudan and were in a position to use their expertise to conduct attacks within Sudan or to pass on their knowledge.

The Lords Resistance Army (LRA) continued to be a threat to Uganda, the Democratic Republic of the Congo (DRC), and Southern Sudan. The Government of Southern Sudan worked to mediate peace between the LRA and the Government of Uganda and sought to curb LRA raids, but achieved little tangible progress. Although LRA attacks declined significantly, renewed violence remains a threat. Formal negotiations commenced in Juba in July 2006. The LRA continued to stall the talks, however, most recently with demands for a change of venue and a halt to all Ugandan People's Defense Forces activity in southern Sudan. Both parties signed a Cessation of Hostilities agreement in August 2006 identifying areas where the LRA could assemble for the negotiations without fear of being attacked by the Ugandan People's Defense Forces.

# SYRIA

The Syrian government continued to provide political and material support to Hizballah and political support to Palestinian terrorist groups. Palestinian Islamic Jihad (PIJ), HAMAS, the Popular Front for the Liberation of Palestine (PLFP), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), among others, base their external leadership in Damascus. The Syrian government insisted that the Damascus-based groups undertake only political and informational activities, but Palestinian groups with leaders in Syria have claimed responsibility for anti-Israeli terrorist acts.

Syria's public support for the Palestinian groups varied, depending on its national interests and international pressure. In April, visiting PA Foreign Minister Zahar (HAMAS) met with Damascus-based Palestinian leaders and attended a rally at the Palestinian Yarmouk refugee camp alongside HAMAS Political Bureau Chief Khalid Mish'al and representatives of other terrorist groups and Hizballah. In July, Mish'al held a highly publicized press conference under tight security at a Damascus hotel, expressing gratitude for Syria's unconditional support to the Palestinian cause.

The Government of Syria has not been implicated directly in an act of terrorism since 1986, although preliminary findings of a UN investigation into the February 2005 assassination of former Lebanese Prime Minister Rafik Hariri indicated a strong likelihood of official Syrian involvement. That investigation remains in process.

On September 12, four Syrian nationals with alleged Islamist ties used grenades, guns, and a small truck bomb to launch an attack against the U.S. embassy in Damascus. All four of the assailants were killed as was a Syrian security officer who responded to the attack. In the incident's aftermath, the Syrian government enhanced security for the embassy and American personnel in Syria, although it declined to provide the embassy with the findings of its internal investigation into the attack. Damascus repeatedly assured the United States that it will take every possible measure to protect U.S. citizens and facilities in Syria, but at the same time has not taken the measures considered necessary by the United States.

In 2004-2005, Syria upgraded physical security conditions on the border and began to give closer scrutiny to military-age Arab males entering Syria. (Visas are still not required for citizens of Arab countries.) It also highlighted the repatriation of more than 1,200 foreign extremists and the arrest of more than 4,000 Syrians trying to go to Iraq to fight. In November, Syria's foreign minister announced the resumption of diplomatic relations with Iraq after a 25-year rupture, and, a month later, the Syrian and Iraqi Ministers of Interior signed a five-year memorandum of understanding to boost, among other things, joint efforts to control the borders and combat terrorism.

As in recent years, Damascus highlighted in Syrian government-controlled press, information about clashes on Syrian territory with terrorist groups, particularly with the Jund a-Sham group. Separately, in November, security agents on the Syrian side of the border with Lebanon engaged in a gun battle with a Syrian Islamic militant from the Tawhid and Jihad group. The militant, who was trying to use fake documents to cross into Lebanon, subsequently blew himself up with a hand grenade.

# CHAPTER 6.
## FOREIGN TERRORIST ORGANIZATIONS

Foreign Terrorist Organization (FTO) aliases cited are consistent with and drawn from the Specially Designated Nationals list maintained by the Department of Treasury. The full list can be found at the following website: www.treasury.gov/offices/enforcement/ofac/sdn/sdnlist.txt.

**Abu Nidal Organization (ANO)**

**Abu Sayyaf Group (ASG)**

**Al-Aqsa Martyrs Brigade**

**Ansar al-Sunna (AS)**

**Armed Islamic Group (GIA)**

**Asbat al-Ansar**

**Aum Shinrikyo (Aum)**

**Basque Fatherland and Liberty (ETA)**

**Communist Party of Philippines/New People's Army (CPP/NPA)**

**Continuity Irish Republican Army (CIRA)**

**Gama'a al-Islamiyya (IG)**

**HAMAS**

**Harakat ul-Mujahedin (HUM)**

**Hizballah**

**Islamic Jihad Union (IJU)**

**Islamic Movement of Uzbekistan (IMU)**

**Jaish-e-Mohammed (JEM)**

**Jemaah Islamiya Organization (JI)**

**Al-Jihad (AJ)**

**Kahane Chai (Kach)**

**Kongra-Gel (KGK/PKK)**

**Lashkar e-Tayyiba (LT)**

**Lashkar i Jhangvi (LJ)**

**Liberation Tigers of Tamil Eelam (LTTE)**

**Libyan Islamic Fighting Group (LIFG)**

**Moroccan Islamic Combatant Group (GICM)**

**Mujahedin-e Khalq Organization (MEK)**

**National Liberation Army (ELN)**

**Palestine Liberation Front (PLF)**

**Palestinian Islamic Jihad (PIJ)**

**Popular Front for the Liberation of Palestine (PFLP)**

**Popular Front for the Liberation of Palestine-General Command (PFLP-GC)**

**Al-Qaida (AQ)**

**Al-Qaida in Iraq (AQI)**

**Al-Qaida in the Islamic Maghreb (AQIM) [Formerly Salafist Group for Call and Combat (GSPC)]**

**Real IRA (RIRA)**

**Revolutionary Armed Forces of Colombia (FARC)**

**Revolutionary Nuclei (RN)**

**Revolutionary Organization 17 November (17N)**

**Revolutionary People's Liberation Party/Front (DHKP/C)**

**Shining Path (SL)**

**United Self-Defense Forces of Colombia (AUC)**

\* Listed on the UN 1267 Committee List.

º Listed on the Terrorist Exclusion List.

^ Designated under Executive Order 13224.

# ABU NIDAL ORGANIZATION (ANO)

a.k.a. Arab Revolutionary Brigades; Arab Revolutionary Council; Black September; Fatah Revolutionary Council; Revolutionary Organization of Socialist Muslims

## DESCRIPTION

The ANO international terrorist organization was founded by Sabri al-Banna (a.k.a. Abu Nidal) after splitting from the Palestine Liberation Organization (PLO) in 1974. The group's previous known structure consisted of various functional committees, including political, military, and financial. In August 2002, Abu Nidal died in Baghdad; the new leadership of the organization remains unclear.

## ACTIVITIES

The ANO has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons; however, the group has not staged a major attack against Western targets since the late 1980s. Major attacks included the Rome and Vienna airports in 1985, the Neve Shalom synagogue in Istanbul, the hijacking of Pan Am Flight 73 in Karachi in 1986, and the City of Poros day-excursion ship attack in Greece in 1988. The ANO is suspected of assassinating PLO deputy chief Abu Iyad and PLO security Chief Abu Hul in Tunis in 1991. The ANO was responsible for the December 1985 simultaneous Rome and Vienna airport attacks in which 12 people died, including five American citizens.

# PALESTINE ISLAMIC JIHAD (PIJ)

a.k.a. Islamic Jihad of Palestine; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Al-Quds Brigades

## DESCRIPTION

Formed by militant Palestinians in the Gaza Strip during the 1970s, Palestine Islamic Jihad (PIJ) is committed to the creation of an Islamic state in all of historic Palestine and the destruction of Israel through attacks against Israeli military and civilian targets.

## ACTIVITIES

PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings against Israeli civilian and military targets. In 2006, the group conducted two suicide bombings and launched numerous homemade rockets from the Gaza Strip into neighboring Israeli towns. PIJ continues to plan and direct attacks against Israelis both inside Israel and in the Palestinian territories. Although U.S. citizens have died in PIJ mounted attacks, the group has not directly targeted U.S. interests.

## STRENGTH

Unknown.

## LOCATION/AREA OF OPERATION

Primarily Israel, the West Bank, and the Gaza Strip. The group's central leadership resides in Syria. Other leadership elements reside in Lebanon and official representatives are scattered throughout the Middle East.

## EXTERNAL AID

Receives financial assistance primarily from Iran.  Syria provides the group with safe haven.

# POPULAR FRONT FOR THE LIBERATION OF PALESTINE (PFLP)

## DESCRIPTION

Formerly a part of the PLO, the Marxist-Leninist PFLP was founded by George Habash when it broke away from the Arab Nationalist Movement in 1967. The PFLP does not view the Palestinian struggle as religious, seeing it instead as a broader revolution against Western imperialism. The group earned a reputation for spectacular international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens.

## ACTIVITIES

The PFLP has stepped up its operational activity since the start of the current intifada, highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of Israeli Tourism Minister Rehavam Ze'evi in 2001, to avenge Israel's killing of the PFLP Secretary General earlier that year. In March 2006, the PFLP's current Secretary

267

General, Ahmed Sa'adat, who had been imprisoned by the Palestinian Authority for his involvement in the Ze'evi assassination, was seized from the Jericho prison compound by Israeli forces and is now awaiting trial.

## STRENGTH

Unknown.

## LOCATION/AREA OF OPERATION

Syria, Lebanon, Israel, the West Bank, and the Gaza Strip.

## EXTERNAL AID

Receives safe haven and some logistical assistance from Syria.

# POPULAR FRONT FOR THE LIBERATION OF PALESTINE–GENERAL COMMAND (PFLP-GC)

## DESCRIPTION

The PFLP-GC split from the PFLP in 1968, claiming it wanted to focus more on fighting and less on politics. Originally, the group was violently opposed to the Arafat-led PLO.  Ahmad Jibril, a former captain in the Syrian Army, whose son Jihad was killed by a car bomb in May 2002, has led the PFLP-GC since its founding.  The PFLP-GC is closely tied to both Syria and Iran.

## ACTIVITIES

The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s. The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders. The group's primary focus now is on guerrilla operations in southern Lebanon, training members of other Palestinian terrorist groups, and weapons smuggling. The PFLP-GC maintains an armed presence in several refugee camps and military bases throughout Lebanon.

## STRENGTH

Several hundred.

## LOCATION/AREA OF OPERATION

Headquartered in Damascus with bases in Lebanon.

## EXTERNAL AID

Receives logistical and military support from Syria and financial support from Iran.